1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

4    TERRY PHILLIPS                          )
                                            )        3:06-CV-00620-LRH (VPC)
5            Plaintiff,                      )
                                            )
6    vs.                                     )        **REPORT AND RECOMMENDATION**
                                            )        **OF U.S. MAGISTRATE JUDGE**
7    GREG COX, *et al.*,                     )
                                            )
8            Defendants.                     )        May 16, 2008
     _____)

9

10           This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

11   District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28

12   U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary

13   judgment (#23).  Plaintiff opposed (#37) and defendants replied (#38).  The court has thoroughly

14   reviewed the record and the motions and recommends that defendants' motion for summary

15   judgment (#23) be granted.

16                          **I. HISTORY & PROCEDURAL BACKGROUND**

17           Plaintiff Terry Phillips ("plaintiff"), a *pro se* prisoner, was formerly incarcerated in the

18   custody of the Nevada Department of Corrections ("NDOC") at the Northern Nevada

19   Correctional Center ("NNCC") (#13).[1]  Plaintiff brings his first amended complaint pursuant to

20   42 U.S.C. § 1983, alleging violations of his Eighth Amendment right against cruel and unusual

21   punishment.  *Id*.  Plaintiff names as defendants Bruce Bannister, NDOC Medical Director; Greg

22   Cox, High Desert State Prison ("HDSP") Warden; Ted D'Amico, former NDOC Medical

23   Director; Bob Hartman, HDSP Director of Nursing; David Mumford, HDSP Physician; and

24   "Ben," "Debbie," and "Peggy," HDSP Nurses.  *Id*.[2]

25   _____

26           [1] Plaintiff was released from prison in August 2007 (#20).

27           [2] The court dismissed defendants Cox, Crawford and Whorton in its screening order of plaintiff's
     original complaint (#5).  The Nevada Attorney General's office then accepted service for defendants
28   D'Amico and Hartman, but not defendants Mumford, "nurse Ben," "nurse Debbie," and "nurse Peggy" (#7).

1    In his amended complaint, plaintiff alleges that prior to his incarceration, he was the

2  victim of a gunshot wound that caused an A-V fistula/malformation in his head.[3]  Plaintiff claims

3  that between July and December 2004, defendants only gave him Tylenol for the pain even

4  though they knew he required medical attention.  Plaintiff admits that during this same time

5  period he also had an angiogram and a cat-scan performed, and saw a vascular surgeon twice.

6  On December 2, 2004, an outside surgeon, Dr. Joseph Caresio, performed an "embolization."

7  Plaintiff claims that when the surgery began, Dr. Caresio stated, "This is not what they said."  In

8  response to plaintiff's questioning, Dr. Caresio told plaintiff that he had not known plaintiff had

9  had an angiogram because defendants did not provide him with it.  After the embolization, Dr.

10  Caresio allegedly told plaintiff that "he did what he could," but that the hole in his artery was too

11  big to correct through an embolization.  Plaintiff claims that defendants deliberately withheld the

12  angiogram from Dr. Caresio, which caused Dr. Caresio to perform the "wrong procedure" on

13  plaintiff, which, in turn, caused irreparable damage to his artery.  Plaintiff claims that he has had

14  two surgical procedures since the first embolization, but has been told that because of what was

15  done on December 2, 2004, it is too dangerous to try to repair the artery now, and that nothing

16  more can be done.

17    Plaintiff further alleges that after defendant Bannister became the NDOC Medical

18  Director, he cancelled all inmate appointments with outside physicians, and plaintiff was not

19  permitted to attend a previously scheduled appointment with a specialist on March 31, 2006.

20  Plaintiff alleges that defendants then put him on methadone for the pain and denied him further

21  treatment.

22    _____

23  Plaintiff then amended his complaint, adding defendant Bannister, and again including unserved defendants
    Cox, Mum ford, "Ben," "Debbie," and "Peggy" (#13).  Defendant Cox was dismissed in the court's original
24  screening order because plaintiff had failed to allege that Cox personally participated in any of the alleged
    constitutional violations (#5).  Plaintiff's amended complaint suffers from the same failure; therefore,
25  defendant Cox should not have been included in plaintiff's amended complaint.  Further, the record does not
    reflect that defendants Cox, Bannister, Mumford, "Ben," "Debbie," or "Peggy" were served with a copy of
26  either the original or amended complaint.

27    [3] "An arteriovenous (AV) fistula is an abnormal passageway between an artery and a vein."  *See*
28  http://www.mayoclinic.com/health/av-fistula/HQ00263.

The Court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an

3

1    element essential to that party's case, and on which that party will bear the burden of proof at

2    trial.  *Celotex*, 477 U.S. at 322-23.

3                    **2. Deliberate Indifference Standard**

4            A prison official violates the Eighth Amendment when he acts with "'deliberate

5    indifference' to a substantial risk of serious harm to an inmate."  *Farmer v. Brennan*, 511 U.S.

6    825, 828 (1994).  To establish an Eighth Amendment violation, a plaintiff's case must satisfy an

7    objective standard – that the deprivation was serious enough to amount to cruel and unusual

8    punishment, and a subjective standard – deliberate indifference.  *Id.* at 834; *see also Wilson v.*

9    *Seiter*, 501 U.S. 294, 297-304 (1991).

10           The objective standard, a "serious medical need," is met if the failure to treat a prisoner's

11   condition could result in further significant injury or the "unnecessary and wanton infliction of

12   pain."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The Ninth Circuit's examples of serious

13   medical needs include "the existence of an injury that a reasonable doctor or patient would find

14   important and worthy of comment or treatment; the presence of a medical condition that

15   significantly affects an individual's daily activities; or the existence of chronic and substantial

16   pain."  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

17           The subjective standard of deliberate indifference requires "'more than ordinary lack of

18   due care for the prisoner's interests or safety.'"  *Farmer*, 511 U.S. at 835, *quoting Whitley v.*

19   *Albers*, 475 U.S. 312, 319 (1986).  The requisite state of mind lies "somewhere between the poles

20   of negligence at one end and purpose or knowledge at the other."  *Id.* at 836.  It is the equivalent

21   of recklessly disregarding a substantial risk of serious harm to the inmate.  *Id.*  Prison medical

22   staff do not violate the Eighth Amendment simply because their opinion concerning medical

23   treatment conflicts with the opinion of the inmate-patient.  *Franklin v. Oregon*, 662 F.2d 1337,

24   1344 (9th Cir. 1981).

25           **B.   Analysis**

26                **1. Procedural History**

27           After defendants filed their motion for summary judgment on September 10, 2007,

28   plaintiff failed to file an opposition.  On October 17, 2007, the court *sua sponte* granted plaintiff

                                                   4

1   an extension of time to file a motion in opposition to defendants' motion for summary judgment

2   (#31).  Instead of filing a substantive opposition, plaintiff filed a motion for enlargement of time

3   to complete discovery (#32/33).  The court denied this motion as plaintiff had previously been

4   granted two discovery extensions (#36).  However, the court granted plaintiff one final extension

5   of time to file a substantive opposition to defendants' motion for summary judgment.  *Id.*

6          On November 30, 2007, plaintiff filed his "opposition," arguing that he was still waiting

7   for medical treatment that would prove his case and would be better able to respond at a later time

8   (#37).[4]  Thus, plaintiff failed to comply with the court's order to substantively respond to

9   defendants' arguments by citing law, making arguments, and submitting evidence to support his

10  allegations.  Even if plaintiff was awaiting medical care, and has since received it, he has not

11  made a request to submit a revised opposition with his new evidence.  There have been no filings

12  in almost six months.  Based on these considerations, the court will proceed on the evidence

13  before it.

14          **2. Merits**

15          Defendants submit the Declaration of Karen Walsh, NDOC Health Information Director,

16  who reviewed plaintiff's medical records on March 14, 2007 (#23, Exhibit D).[5]  According to

17  plaintiff's medical records, plaintiff reported to medical staff that he received a gunshot wound

18  to the head in 1994, and as a result, suffers from an "arteriovenous (AV) fistula."  *Id.* at ¶ 6a-b.

19  Plaintiff received an angiogram on July 22, 2004, which confirmed the presence of the AV fistula.

20  *Id.* at ¶ 6c.  Plaintiff saw Dr. Earl Cottrell, a vascular specialist, on August 25 and September 8,

---

[4] Plaintiff attached three medical documents from the University Medical Center in Las Vegas dated November 20, 2007.  *Id.*, Exhibits 1-3.  These documents indicate that as of November 2007, plaintiff was in the process of obtaining approval for an angiogram.  *Id.*  The documents further state that plaintiff's diagnosis is "L Temporal AV fistula," and that he needs a "carotid angiogram with cranial views and possible embolization."  *Id.*  While this supports NDOC's diagnosis, it does nothing to prove plaintiff's claims of deliberate indifference.

[5] The court notes that defendants submit Ms. Walsh's declaration instead of plaintiff's medical records.  While a declaration is sufficient evidence, the court prefers reviewing the medical records in tandem with the declaration, and directs counsel to submit copies of the relevant medical records in future Eighth Amendment cases.

1  2004. *Id*. at ¶ 6d-e. At Dr. Cottrell's request, plaintiff received a cat-scan of his head on October

2  10, 2004. *Id*. at ¶ 6d, 6f. On December 2, 2004, an outside surgeon, Dr. Caresio, performed an

3  embolization to repair the AV fistula. *Id*. at ¶ 6g.

4       On February 24, 2005, plaintiff was transferred to NDOC's Regional Medical Center at

5  NNCC. *Id*. at ¶ 6h. Dr. Janet Albright performed a second embolization procedure on plaintiff

6  on August 3, 2005, and a third embolization on October 3, 2005. *Id*. at ¶ 6i-k. Plaintiff received

7  a follow-up visit with Dr. Albright in between these two procedures. *Id*. Dr. Albright notified

8  plaintiff in April 2006 that she believed that plaintiff's AV fistula was not suitable for further

9  surgery and that she did not think it could be further treated with conventional treatments. *Id*.

10 at ¶ 6l. Ms. Walsh states in her declaration that while plaintiff was on "virtually continuous pain

11 medication" between July 2004 and the date of his release, his medication "was adjusted on

12 several occasions for various reasons." *Id*. at ¶ 6n-o.

13      Plaintiff attached evidence to his complaint which reveals that in October 2004, he was

14 in pain and awaiting surgery (#13, Exhibit A, p. 8-A-1). After his December 2, 2004 surgery,

15 plaintiff complained in grievances that Dr. Mumford refused him a follow-up visit with Dr.

16 Caresio, discharged him from the infirmary to general population, and discontinued plaintiff's

17 Tylenol #3 prescription. *Id*. at p. 8-A-2 to 8-A-7. Plaintiff was given regular Tylenol, which he

18 stated did not help his headaches that were "worse & now in '3'areas of my head & swelling is

19 now in my jugular vein on the right side." *Id*. at 8-A-2 .

20      Defendant Hartman responded to these grievances. He cited plaintiff's medical chart,

21 which revealed that on December 29, 2004, Dr. Caresio informed Dr. Mumford that plaintiff's

22 AV malformation was "large" and "not suitable" for further embolization. *Id*. at p. 8-A-7. Dr.

23 Caresio suggested that plaintiff be evaluated by a neurosurgeon in six months. *Id*. According to

24 plaintiff's chart, Dr. Mumford told plaintiff this information and plaintiff understood. *Id*.

25 Further, aside from the continued chronic headaches, plaintiff reported having improved

26 symptoms. *Id*. Dr. Mumford stated that he discontinued the Tylenol #3 so that plaintiff could

27 be discharged to the yard. *Id*. On January 4, 2005, the medical chart indicates that plaintiff asked

28 to be re-admitted to the infirmary, but Dr. Mumford denied his request. *Id*. Dr. Mumford stated

1    that plaintiff became "very angry at my refusal to admit him to the Infirmary for protection." *Id*.

2    Plaintiff denies that he asked for protection and states that he was simply trying to get medical

3    treatment. *Id*. Dr. Mumford saw plaintiff again on January 25, 2005. *Id*. at 8-A-8.

4        Between February and April 2005, plaintiff filed grievances and wrote to the Inspector

5    General's office stating that the medical department was ignoring his medical kites and that they

6    would not allow him a copy of his medical file. *Id*. at 8-A-10 to 8-A-22. As noted above,

7    plaintiff was then transferred to the Regional Medical Facility, and received two more

8    embolizations in 2005.[6]

9        In March or April 2006, Dr. Albright spoke with specialists in Reno about plaintiff's

10   condition. *Id*. at 8-A-40. As a result of these conversations, Dr. Albright determined that there

11   was nothing more that could be done to treat plaintiff; thus, plaintiff's March 31, 2006 follow-up

12   appointment with an outside specialist was cancelled. *Id*. The evidence further indicates that Dr.

13   Albright believed that plaintiff's "only option is possibly a research facility in Calif. like

14   Stanford." *Id*. Plaintiff was given this information on April 11, 2006. *Id*. Plaintiff filed a

15   grievance stating that he was being denied medical care and asking why he could not be sent to

16   Stanford. *Id*. at 8-A-25 to 8-A-31. NDOC Medical Director Bannister responded, stating that he

17   had spoken with plaintiff's physicians, that the physicians were aware of plaintiff's condition, and

18   that plaintiff was being treated appropriately. *Id*. at 8-A-31. During this time, there is some

19   evidence indicating that plaintiff was not receiving his prescribed pain medication.

20       In November 2006, plaintiff requested another consultation with Dr. Albright, and was

21   placed on the "M.D. list" (#23, Exhibit C-2, pp. 27-28). It is unclear whether he ever saw Dr.

22   Albright. Plaintiff was discharged from prison in August 2007.

23       In response to an interrogatory, plaintiff described his current symptoms to include blood

24   build-up in his neck and head, pounding and ringing in his right ear, severe headaches, and

25

26       [6] Plaintiff also submits a declaration which details separate attempts by two NNCC caseworkers to get plaintiff to sign paperwork declaring that NDOC could disregard his grievances, that he was receiving

27   proper medical care, and that all his problems had been resolved (#13, Exhibit A, p. 8-A-24). These attempts were allegedly at the request of NNCC's Assistant Warden and in response to the prison discovering that

28   plaintiff was trying to hire a lawyer. Plaintiff refused to sign.

1  pounding on the right side of his head (#23, Exhibit B-2, Interrogatory Response 10).  He also

2  stated that he often has sharp chest pains, and gets nauseated from the pain he endures.  *Id.*

3       Defendants argue that plaintiff received sufficient medical care, but that if the court finds

4  otherwise, defendants actions constitute negligence only (#23, p. 6).  Plaintiff does not respond

5  except to state that he will be submitting evidence in the future.[7]

6       There is no question that plaintiff's medical condition constitutes a "serious" medical

7  condition.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  However, there is no evidence that

8  defendants acted with deliberate indifference.  Even taking as true plaintiff's allegation that Dr.

9  Caresio did not see the angiogram prior to the December 2, 2004 embolization – which

10  defendants do not deny – there is no evidence that this was intentional on defendants' part.  Based

11  on the evidence currently before the court, the most this lapse would constitute is negligence.

12  Negligence is not actionable under the Eighth Amendment.  *Toguchi v. Chung*, 391 F.3d 1051,

13  1057 (9th Cir. 2004).

14       Moreover, there is no evidence to demonstrate that had Dr. Caresio seen the angiogram

15  prior to the December 2, 2004 embolization, he would have performed a different procedure.

16  Although plaintiff claims that Dr. Caresio performed the "wrong procedure," plaintiff does not

17  inform the court or even allege what procedure should have been performed and why this would

18  have made a difference.  There is no evidence which demonstrates that another procedure would

19  have been more successful.

20       Finally, there is no evidence that the performance of the December 2, 2004 embolization

21  caused irreversible harm to plaintiff's condition.  Even though plaintiff alleges that his AV fistula

22  can never be repaired as a consequence of the December 2, 2004 embolization – which plaintiff

23  claims never would have occurred had Dr. Caresio seen the angiogram – plaintiff has failed to

24  present any evidence to support this allegation.

25

26

27  [7] Defense counsel affirms that plaintiff also failed to propound any discovery requests (#23, Exhibit A, ¶ 15).  Further, defense counsel affirms that plaintiff produced only thirteen pages of documents in response to her requests, but indicated that the documents attached to his complaint were responsive to defendants' discovery requests.  *Id*. at ¶¶ 10, 12.

28

It is clear from the evidence that in 2004, plaintiff received pain medication, an angiogram, a cat-scan, two appointments with a vascular surgeon, and an embolization. In 2005, he was moved to NNCC, and received two more embolizations and further visits with vascular surgeons. After three embolizations, plaintiff's physicians consulted with outside specialists and concluded that nothing more could be done to assist plaintiff. The evidence also indicates that plaintiff's March 31, 2006 appointment with an outside physician was not cancelled as a result of defendant Bannister's policy, but because there was no further conventional treatment available to plaintiff. Plaintiff has cited no case which stands for the proposition that the Eighth Amendment requires defendants to send inmates out-of-state for experimental treatments. Based on the evidence before the court, the court concludes that there are no genuine issues of material fact, and that plaintiff has not presented evidence which demonstrates that defendants acted with deliberate indifference.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that plaintiff has failed to present any evidence to support his allegations that defendants deliberately withheld medical evidence from his specialist. The court further concludes that there is no evidence that this specialist performed the wrong procedure on plaintiff as a result of not receiving plaintiff's angiogram, or that the procedure cause irreversible damage to plaintiff's condition. As such, the court recommends that defendants' motion for summary judgment (#23) be **GRANTED**.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#23) be **GRANTED**.

**DATED:** May 16, 2008.

_____

**UNITED STATES MAGISTRATE JUDGE**

10